IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYVANIA

| | |
|---|---|
| MICHAEL HOGUE,<br>    Plaintiff | : NO. 12-708 |
| v. | : CIVIL ACTION LAW |
| FREDERICK CHEVROLET-<br>CADILLAC, INC. and JONESTOWN<br>BANK AND TRUST,<br>    Defendants. | |

## DEFENDANT'S JOINT STATEMENT OF MATERIAL FACTS

AND NOW, come Defendants, Frederick Chevrolet-Cadillac,Inc. (FCC) and Jonestown Bank and Trust (JBT), by and through their undersigned Counsel, Peggy M. Morcom, and sets forth the following Joint Statement of Material Facts in support of Defendants' (individual) Brief in Support of Motion to Dismiss, stating as follows:

1. Jonestown Bank and Trust is a financial institution, located at 421 East Penn Avenue, Cleona, Pennsylvania 17042.

2. Frederick Chevrolet-Cadillac, Inc. (FCC) is an automobile dealership, located at 1505 Quentin Road, Lebanon, PA 17042.

3. Donald Schlegel, is the Manager, Dealer Department for Jonestown Bank and Trust, situated at 421 East Penn Avenue, Cleona, Pennsylvania, and he has held this position since October 1999.

4. On October 20, 2011, no representative of JBT was present at the tent sale of FCC. (Affidavit of Donald Schlegel, attached hereto as Exhibit 1.)

5. On October 20, 2011, no representative of JBT had contact with Plaintiff. (Exhibit 1)

6. James Allison is the Sales Manager at FCC (Allison) and has been in this position for over 20 years. (Exhibit 2)

7. Jeremy Crane is the Used Car Director at FCC (Crane) and has been in that position for approximately five years. (Affidavit of Jeremy Crane, attached hereto as Exhibit 3, including supporting documents)

8. Crane attended the tent sale event on October 20, 2011 at FCC's Lancaster, Pennsylvania location (sales event). (Exhibit 3)

9. Crane worked with Hogue on the purchase of a used vehicle. (Exhibit 3)

10. Hogue wanted to purchase the 2007 Chrysler 300 (vehicle). (Exhibit 3)

11. Prior to FCC placing the vehicle on the lot for purchase, it was inspected by FCC's service department. (Exhibit 3)

12. During Crane's discussion with Hogue, Hogue advised him that his current vehicle was a Toyota Zephyr (Zephyr).

13. On October 20, 2011, Allison prepared the documentation related to the sale of the 2007 Chyrsler 300 (vehicle) to Michael Hogue (Hogue). (Affidavit of James B. Allison, attached hereto as Exhibit 2, including supporting documents; Exhibit 3)

14. Allison prepared the Purchase Order/Agreement (Order) and the Simple Interest to Party Agreement (Agreement) related to the purchase of the vehicle by Hogue. (Exhibit 2)

15. Hogue agreed to purchase the vehicle for $20,500.00 from FCC, and the amount financed was $24,486.65 at an annual percentage rate of 5.49%. The Order and Agreement were executed by Hogue on October 20, 2011. (Exhibit 2; Exhibit 3; and Exhibit attached to the Complaint)

16. Hogue authorized FCC to retrieve his credit report. (Exhibit 2; Exhibit 3)

17. Allison retrieved Hogue's credit report, evaluated it, and determined the Annual Percentage Rate (interest rate) based upon his credit score. (Exhibit 2; Exhibit 3)

18. FCC did not require or request Hogue to make a cash down payment, and Hogue did not make any cash payment to FCC. (Exhibit 2; Exhibits attached to the Complaint; Exhibit 3)

19. Hogue did not trade a vehicle as part of the purchase. (Exhibit 2; Exhibit 3; and Exhibits attached to the Complaint)

20. Once a buyer signs the Order and Agreement to purchase a vehicle from FCC, FCC is the lender until such time when FCC decides to assign the loan to a bank. (Exhibit 2; Exhibit 3; Exhibit 4)

21. On October 20, 2011, Crane faxed the standard request for credit form used by FCC to obtaining financing by JBT was faxed to JBT for evaluation. (Exhibit 1; Exhibit 3)

22. On October 24, 2011, Schlegel retrieved Hogue's TransUnion credit report through HART Software, Inc., a credit software company with whom JBT contracts to obtain credit reports through TransUnion. (Exhibit 1)

23. It is Schlegel's standard practice and procedure to create the declination letter that sets forth the requirements to obtain the loan, i.e. co-signer, collateral, etc., and it is used to advise the prospective buyer that his/her credit request was denied and the basis for denial. (Exhibit 1)

24. When Hogue's TransUnion credit report was retrieved and reviewed on October 24, 2011, it reflected a credit/FICO score of 674 and limited credit based on seven deferred loans. (Exhibit 1)

25. Schlegel reviewed Hogue's credit report and credit application, and based on JBT's standards for authorizing/accepting credit, Schlegel determined that a co-signer was necessary to effectuate the automobile loan for Hogue. (Exhibit 1)

26. If FCC decides not to assign the loan to a lender, the contract remains with FCC, and the buyer's obligation to make payments is with FCC. (Exhibit 2; Exhibit 3; Exhibit 4).

27. Once a buyer enters into a contract with FCC, loan payments are to be made to FCC, unless the buyer is otherwise notified that the loan was assigned to a lender. (Exhibit 2; Exhibit 3; Exhibit 4)

28. On October 20, 2011, after executing the Order and Agreement, Hogue took possession of the vehicle, leaving FCC's sales event with the vehicle. (Exhibit 3).

29. On October 24, 2011, JBT responded to the request for assignment by FCC, and JBT indicated that a co-signer was required for the assignment to JBT. (Exhibit 3).

30. On October 24, 2011, Schlegel generated a declination letter through HART Software and mailed to Hogue at 661 Golden Eagle Way, Lancaster, PA 17601, indicating a co-signer was required and the basis for JBT's decision to require a co-signer. (Exhibit 1)

31. In Schlegel's 13 years as Manager Dealer Department, there has never been a time when a declination was not issued to a credit applicant and mailed to the credit applicant. (Exhibit 1)

32. The letter to Hogue was not returned to JBT as "undeliverable." (Exhibit 1)

33. Schlegel never spoke with Hogue or communicated with him in writing regarding obtaining automobile financing from JBT to purchase a vehicle at FCC, other than the issuance of the declination letter. (Exhibit 1)

34. While it is JBT's Cleona, Pennsylvania branch's practice to store banking documents in the basement (documents) of the financial institution, on September 8, 2011, central Pennsylvania suffered significant flooding, and President Obama declared a state of emergency in Pennsylvania. (Exhibit 1)

35. As a result of the significant flooding to the basement of JBT, all documents were relocated to the main floor of the bank. This included a variety of documents, including but not limited to, credit applications, declination letters and credit reports. (Exhibit 1)

36. When the documents were moved to the main floor of the bank, we placed wet documents in an office for purposes of drying out. All dry documents were placed in a second office, which we also used for new documents generated by JBT (which would normally have been filed in the basement, except for the flooding), including declination letters, credit applications and credit reports. (Exhibit 1)

37. Due to the massive clean-up following the flood, JBT's retrieval and salvage of documents was organized based on prior wet documents in one office, and prior dry documents and new credit documents, including declination letters, in a separate office. As JBT was attempting to recover from the flood and continue to conduct business, JBT's filing system was in a state of flux and reorganization. (Exhibit 1)

38. In late October 2011, approximately 1 ½ months after the flood, JBT was still involved in significant clean-up efforts, and documents which were once stored in the basement could not be returned to the basement due to clean-up efforts. From September 9, 2011 through March 2012, documents created and normally filed in the basement were placed with documents that were previously contained in the basement. This would include Hogue's credit application and the October 24, 2011 declination letter addressed to Hogue. (Exhibit 1)

39. It was not until March 2012 that JBT was in a position to reorganize documents and return documents to the basement filing space. (Exhibit 1)

40. As of this date and after an exhaustive search, JBT cannot locate the declination letter for Hogue, but Schlegel has never deviated from our practices in retrieving credit reports, creating declination letters, and mailing of declination letters to credit applicants. (Exhibit 1)

41. JBT never approved, and therefore never funded, the contract for Hogue to purchase the vehicle, because all fully executed documents were not received by JBT related to Hogue's purchase of the vehicle. (Exhibit 1)

42. JBT only establishes an automobile loan upon receipt of the Agreement, proof of insurance and identification from FCC. (Exhibit 1)

43. It is not until an automobile loan is established by JBT that a buyer receives formal notification from JBT of his/her commitment to make payments to JBT for the purchase of an automobile. (Exhibit 1)

44. To this date, JBT has never maintained a loan of any kind for Hogue. (Exhibit 1)

45. Hogue is not in default on a JBT automobile loan because no loan ever existed. (Exhibit 1)

46. Hogue never received billing statements or requests for payment from JBT related to an automobile loan because no loan exists.(Exhibit 1)

47. Hogue never made a payment to JBT for an automobile loan. (Exhibit 1)

48. As a financial institution, JBT was never in possession of the 2007 Chrysler 300 (vehicle) that Hogue sought to finance through JBT via FCC. (Exhibit 1)

49. On October 24, 2011, and at least two additional occasions between October 24, 2011 and October 31, 2011, Crane contacted/spoke with Hogue, and advised him that JBT required a co-signer in order to "finance" (accept assignment) the vehicle. Hogue indicated he would have his mother co-sign the Agreement for the vehicle. (Exhibit 3).

50. On or about October 27, 2011, Hogue informed Crane that he intended to have the Zephyr voluntarily repossessed by the original lender. Crane informed Hogue that if he decided to have the Zephyr voluntarily repossessed, it would void any conditions of approval with a potential (assigned) lender. (Exhibit 3)

51. At no time did Crane advise Hogue, or any other buyer, to voluntarily repossess their vehicle because Crane, as Used Car Director, understood the significant impact of such action. Crane informed Hogue of the consequences of repossession.(Exhibit 3)

52. The assignment of a loan may take up to at least 30 days after purchase of the vehicle. As a result, the buyer's first loan payment does not become due until 45 days after the execution of the Purchase Order and Simple Interest to Party Agreement. Hogue's first payment was due on December 4, 2011, 45 days after the purchase of the vehicle (October 20, 2011). (Exhibit 2)

53. During Allison's employment, he does not recall an occasion when FCC took a vehicle back from a buyer after purchase and prior to the first payment's due date. (Exhibit 1; and Exhibit 2)

54. On October 31, 2011, Hogue contacted FCC because the vehicle suffered mechanical problems. It was promptly towed to FCC's Lebanon, Pennsylvania location for service. (Exhibit 3)

55. FCC provided Hogue a loaner vehicle while his vehicle was being serviced. (Exhibit 3)

56. The vehicle was serviced, and after service was completed, Hogue was contacted to retrieve the vehicle and to return the loaner vehicle to FCC. Hogue did not retrieve the vehicle.(Exhibit 3)

57. Within days of service being completed, Crane was involved in a telephone conference with Hogue and his mother regarding his mother acting as a co-signer. Hogue indicated that his mother would be the co-signer. However, during the telephone conversation, Hogue's mother indicated that she believed

the vehicle was too expensive, that Hogue could not afford the payments, that the payments were too high, and that she was unwilling to be a co-signer on Hogue's behalf. Hogue's mother also indicated that Hogue's Zephyr had a blown engine. Crane recommended that the Zephyr be repaired. Most of that telephone conference involved Hogue and his mother speaking/arguing with each other, with me listening. At the conclusion of the conversation, Crane understood Hogue still wanted the vehicle, despite his mother's expressed concerns. (Exhibit 3)

58. The vehicle remained in our Lebanon service area unretrieved by Hogue. After approximately two weeks of the vehicle remaining in our service area, Crane contacted Hogue and advised him that if he did not intend to retrieve the vehicle, he needed to return the loaner vehicle. He informed Crane that he no longer wanted the vehicle. Crane advised Hogue that he must return the loaner vehicle. Crane also informed him that if he did not return the loaner vehicle, Crane would be forced by him to contact the appropriate authorities to retrieve the loaner vehicle. (Exhibit 3)

59. Within days, Hogue returned the loaner vehicle to the Lebanon location of FCC, but he did not retrieve the vehicle. (Exhibit 3)

60. At no time was Schlegel or JBT aware that FCC provided Hogue a loaner vehicle while the vehicle was being repaired. (Exhibit 1)

61. Neither Schlegel nor JBT are involved in the issuance of loaner vehicles to customers of FCC, including Hogue. (Exhibit 1)

62. Crane received a final telephone call from Hogue, who again informed me that he was not interested in purchasing the vehicle. Crane again suggested to Hogue that he repair the Zephyr and continue to use it.

63. In or about early November 2011, Crane informed Allison that the vehicle purchased by Hogue on October 20, 2011, was towed and serviced at FCC's Lebanon, PA location, and Hogue refused to retrieve the vehicle from the Lebanon location's service area. Hogue also informed Crane that he no longer wanted the vehicle. (Exhibit 2; Exhibit 3; Exhibit 4)

64. Once Allison was aware that Hogue no longer wanted the vehicle, Allison stopped his attempts to assign the FCC loan to a lender. (Exhibit 2)

65. At no time was Hogue denied credit by FCC to finance the vehicle. (Exhibit 2; Exhibit 3; Exhibit 4)

66. At no time did Crane or Allison inform Hogue that he could not purchase the vehicle. (Exhibit 2; Exhibit 3)

67. At no time did Crane inform Hogue that FCC wanted him to return the vehicle (Exhibit 3)

68. Upon execution of the Agreement and Order, Hogue owed FCC monthly payments of $449.27, beginning December 4, 2011, and continuing for 63 months. (Exhibit 2; Exhibit 4; and Exhibits attached to Plaintiff's Complaint)

69. The FCC loan was never assigned to a lender, although FCC was actively seeking an assigned lender, including Jonestown Bank and Trust (JBT), because Hogue communicated to Crane and FCC that he no longer wanted the vehicle, and Hogue refused to retrieve the vehicle from FCC after service on October 31, 2011. (Exhibit 2; Exhibit 4)

70. Hogue never owed any money to any lender (including JBT) related to the vehicle, other than FCC. (Exhibits 1; Exhibit 2; Exhibit 3; Exhibit 4)

71. Hogue was only obligated to pay FCC. (Exhibit 2; Exhibit 3; Exhibit 4)

72. Hogue "technically" defaulted on the loan with FCC because no payments were made by Hogue to FCC, but no action was taken by FCC against Hogue because Hogue refused to retrieve the vehicle after October 31, 2011 and advised Crane that he no longer wanted to purchase the vehicle. (Exhibit 2; Exhibit 4)

73. Despite Hogue failing to make even one payment to FCC, FCC did not attempt to collect the debt because Hogue never retrieved the vehicle from FCC following service, and Hogue informed FCC that he no longer wanted the vehicle. (Exhibit 2; Exhibit 3; Exhibit 4)

74. Since October 31, 2011, Hogue has not retrieved the vehicle from FCC. The vehicle remains at FCC's Lebanon, Pennsylvania location. (Exhibit 2; Exhibit 3; Exhibit 4)

75. At no time did FCC repossess the vehicle. (Exhibit 2; Exhibit 3; Exhibit 4)

76. At no time did FCC consider Hogue to have been denied credit. (Exhibit 2; Exhibit 3; Exhibit 4)

77. FCC is only in possession of the vehicle because Hogue refused to retrieve it, and Hogue indicated to Crane that he no longer wanted to purchase the vehicle. (Exhibit 2; Exhibit 3; Exhibit 4)

78. There was no revocation of Hogue's credit by FCC. (Exhibit 2; Exhibit 3; Exhibit 4)

79. Hogue rescinded the Order and Agreement in early November 2011 by not retrieving the vehicle from FCC, and also by notifying FCC that he no longer wanted the vehicle after service. (Exhibit 2; Exhibit 3; Exhibit 4)

80. FCC accepted Hogue's actions to rescind the Order and Agreement despite failing to comply with the cancellation terms specifically outlined in the Order above Hogue's signature. (Exhibit 2; Exhibit 3; Exhibit 4)

81. The Order provides that "cancellation or refusal to take delivery by the purchaser will result in the buyer (Hogue) to forfeit damages." Hogue's signature is located directly below this language on the Order. (Exhibit 2; Exhibit 3; Exhibit 4; and the Exhibit attached to Plaintiff's Complaint)

82. As a result of Hogue rescinding the Order and Agreement less than 30 days after purchase of the vehicle and prior to the first payment being due, no report of a loan to FCC was reported to any credit reporting agency related to Hogue. (Exhibit 2; Exhibit 3; Exhibit 4)

83. FCC did not report a failure to make any payments by Hogue because Hogue refused to retrieve the vehicle after October 31, 2011, and Hogue indicated he no longer wanted the vehicle less than 30 days after the purchase of the vehicle and prior to the first payment due date. No negative reporting was made to any credit reporting agency related to Hogue by FCC. (Exhibit 2; Exhibit 3; Exhibit 4)

84. Since the filing of this lawsuit, Hogue was advised that the vehicle is located at FCC's Lebanon, Pennsylvania location if he is interested in performing pursuant to the Order and Agreement. (Exhibit 2; Exhibit 3; Exhibit 4)

85. Other than on October 20, 2011, Allison had no further contact with Hogue related to the vehicle. (Exhibit 2)

Respectfully submitted, this the 24th day of July, 2011.

*s/Peggy M. Morcom, Esquire*
Peggy M. Morcom, Esquire
ID No.: 92463
REILLY, WOLFSON, SHEFFEY,
  SCHRUM & LUNDBERG, LLP
1601 Cornwall Road
Lebanon, PA 17042
717-273-3733
pmorcom@leblaw.com

Case 1:12-cv-00708-JEJ   Document 11   Filed 07/30/12   Page 11 of 11

## **CERTIFICATE OF SERVICE**

I, Peggy M. Morcom, Esquire, do hereby certify I served a copy of the foregoing document via ECF on the date set forth below, as follows:

Matthew B. Weisberg, Esquire
Weisberg Law, P.C.
7 South Morton Avenue
Morton, PA 19070

s/Peggy M. Morcom
Peggy M. Morcom, Esquire